UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON
CASE NO. 5:23-CR-139-01-GFVT

UNITED STATES OF AMERICA                                                                    PLAINTIFF

v.

KYLE JAY KNEZEVICH                                                                          DEFENDANT

**SENTENCING MEMORANDUM AND
REQUEST FOR A DOWNWARD VARIANCE**

      Comes the Defendant, Kyle Jay Knezevich, through counsel, and submits the following Sentencing Memorandum setting forth factors that the Court should consider in determining a sentence sufficient for Mr. Knezevich (hereafter referred to as "Kyle") and to comply with the statutory directives set forth in 18 U.S.C. §3553(a)(1). While the parties in this case entered into a plea agreement discussing calculations pursuant to the United States Sentencing Guidelines, those calculations are not mandatory[1] and are only one of the factors to consider under 18 U.S.C. §3553(a) in imposing a sufficient but not greater than necessary sentence. It is respectfully requested and submitted that a sentence at or approaching the statutory mandatory minimum is reasonable and necessary to satisfy the ends of retribution, deterrence and rehabilitation. Such a sentence would reflect the seriousness of the offense, protect the public and provide a just punishment based on Kyle's involvement in the offense and his individualized characteristics reasonably necessary to comply with the directives of §3553.

---

[1] United States v. Booker, 543 U.S. 220 (2005).

I.  INTRODUCTION

Kyle Jay Knezevich stands before the Court having consented to the filing of the Information and voluntarily entered a guilty plea to the Production of Child Pornography in violation of 18 U.S.C. §2251(a) and (e) as alleged in the Information and set-forth in the Plea Agreement. This conviction stems from Kyle producing, collecting and retaining unlawful images involving videos of minors obtained from recording devices he placed or carried into public restrooms. When Kyle was initially contacted by law enforcement after the discovery of a recording device in a restroom at his place of work, he readily admitted his involvement and role in his improper actions, consented to the search of his residence and identified and provided his electronic devices to law enforcement. He cooperated in the investigation of the instant offense and has fully accepted responsibility for his actions. Following his arrest, he immediately resigned his positions as Associate Professor at Eastern Kentucky University, as swim coach at Model Laboratory High School, and as an aviation operation consultant at Blue Grass Airport.

II.  HISTORY AND CHARACTERISTICS/NATURE OF THE OFFENSE – 18 U.S.C. §355(a)(1).

This section addresses Kyle's history and characteristics, as well as the nature and circumstances of the offense. This includes information from Kyle and the letters of support attached hereto as Exhibit A. This is intended to supplement the Presentence Investigation Report by providing additional information regarding Kyle's character and background.

A.  UPBRINGING AND FAMILY HISTORY

Kyle Knezevich is thirty-six (36) years old and is the first of two (2) children born to Richard and Karen Knezevich. Although born in Dallas, Texas, Kyle grew up in Richmond, Kentucky, and has always considered Richmond his home. His father was an engineer with

Goodyear and his mother was a middle school teacher in the Madison County School District. Both of his parents are now retired. Kyle has always been close to his family and especially his parents and brother Kevin. Both boys had an aptitude for competitive swimming that began as young children at the Arlington Country Club, continuing through elementary and high school at Model Laboratory School and as adults as swim coaches. Kevin currently heads the aquatic program at Eastern Kentucky University. At the time of his arrest, Kyle was co-coach of the Model High School swim team. Kyle's involvement in competitive swimming has been an extensive lifelong endeavor. According to his mother:

> Kyle . . . demonstrated leadership skills across the spectrum. As early as high school, he was swim team captain. Throughout college and graduate school, he held various coaching positions and mentored students as a graduate assistant.

As a child, Kyle was highly motivated in swimming and school. At an early age he envisioned a career in aviation. Kyle had a loving and caring childhood. He talks to his brother regularly and his mother daily. He also stays in contact with his family members via tablet. His family would routinely gather to celebrate birthdays and holidays together. He remains close to all of his family members.

Kyle is described by those that know him as honest, hard-working, passionate about teaching, well-respected by his colleagues, students and throughout the Richmond community. Associates at Eastern, students, swim teammates and swim team parents all have spoken of his good character. Those that have submitted letters uniformly state that they were "shocked," "saddened" and that "the whole town was stunned" upon hearing of his arrest and the substance of the charges. This was not the person who they knew, many of which have known him nearly their entire lifetimes.

## B. PHYSICAL AND MENTAL HEALTH

Kyle, although physically healthy, at age 36 is legally blind in both eyes. He has worn glasses since he was a young child. In 2016, with his vision failing, he was diagnosed with Enhanced S-Cone Syndrome. Enhanced S-Cone Syndrome is a degenerative genetic eye disorder of the retina.[2] He has been under the care of Dr. John Kitchens at Retina Associates of Kentucky for the last 10 years. Dr. Kitchens relates that Kyle has a massive macular schisis, profound night vision issues and has a visual acuity of 20/200 in both eyes. Dr. Kitchens' report is attached hereto as Exhibit B. Kyle is currently prescribed eye-drop medication to alleviate swelling in his eyes.[3] This medication is suitable for long-term use and is approved by the Bureau of Prisons. There is no known cure. Enhanced S-Cone Syndrome is a degenerative disease that will progressively cause further loss of vision.

Kyle's vision is blurry to an extent he is unable to read print without significant magnification. He has been provided with limited magnification while currently incarcerated, which is insufficient to allow him to read regular sized print. Kyle was provided with a lighted enhanced magnifying glass in order to read documents related to these proceedings. At home and at work, Kyle had enlarged print on his computer screens in order to read.

---

[2] Enhanced S-Cone Syndrome (ESCS) is an inherited eye disorder that affects the retina (the back of the eye). There are two different types of photoreceptors (cells that respond to light) in the retina: rods and cones. Rods function best in dim light, while cones function best in bright light and are able to distinguish colors. In ESCS, some of the cells in the retina that were meant to become rod cells are directed by the body to become cone cells instead. In addition, people with ESCS end up having more S-cones (cells that respond to blue light) than other types of cone cells (red (L) or green (M) ). The condition is therefore called Enhanced S-Cone Syndrome, because there are a greater number of S-cones and fewer rods and other cones than would normally be expected. This change in the photoreceptor cells causes people to have more trouble seeing at night or in the dark, have decreased visual acuity (blurry vision), and can sometimes also cause retinoschisis (separation of layers of the retina). Since retinoschisis also occurs in XLRS, these two conditions can sometimes have very similar symptoms. Symptoms of ESCS vary greatly from person to person, even within the same family. Report, Kellogg Eye Center, University of Michigan, May 23, 2016.

[3] He is prescribed eye drops with a combination of non-steroidal and anhydrase inhibitors.

4

Kyle's mental condition remains strong as his core values and upbringing are exhibited in his resolute acceptance of responsibility. As described by those that know him best, he has "deep remorse and responsibility for his actions" and was "devastated" for his family, his University and the entire community.

### C. EMPLOYMENT HISTORY

Kyle's dedication and success in competitive swimming throughout his childhood and high school impressed the long-term and successful swim coach of Model Laboratory School and the Arlington Country Club (both of which are affiliated with Eastern Kentucky University). The swim coach, Tim Cahill, after being diagnosed with a terminal illness, selected Kyle at age 16 to serve as his assistant coach with him assuming day-to-day coaching responsibilities of the swim teams during Coach Cahill's illness. He was later joined by his brother Kevin when Mr. Cahill passed. According to Barbara Shafer, Athletic Director at Model:

> Following Coach Cahill's unexpected death from pancreatic cancer of which the swim community in Richmond and beyond was absolutely rocked, both Kyle and his brother Kevin took up the cause and continued on with the swim team in a coaching capacity (in addition to their full-time jobs). I will say that they both made every effort to keep Coach Cahill's spirit alive by following in his footsteps in the manner that he would have been proud of.

Kyle has participated in coaching swimmers virtually his entire adult life, throughout his undergraduate career at Eastern Kentucky University (B.S. Science and Aviation 2010) and following the attainment of his Master's degree when he returned to Kentucky.

Kyle was a graduate teaching assistant at Middle Tennessee State University while in graduate school. (M.S. Science and Aerospace, 2012) As a teaching assistant, Kyle was assigned classroom instruction, including lectures, assignments and preparing, administering and grading examinations. Upon attaining his Master's degree in 2012, he was hired as an Operations

5

Specialist at Blue Grass Airport. His primary responsibility was ensuring regulation compliance with all federal, state safety requirements. During this period, Kyle lived in Lexington, Kentucky. In 2016, Kyle applied and was accepted as an Assistant Professor at Eastern Kentucky University. Kyle relished teaching in aviation. He was subsequently promoted to the Associate Professor position. Madelynn Nasrallah, in her letter to the Court, states as a student:

> I have known Mr. Knezevich since 2015 in both professional and personal settings. I know Mr. Knezevich as a hard working and professional individual that cared deeply about his profession and the community. Mr. Knezevich was passionate about his work in aviation at the Bluegrass Airport and his role at Eastern Kentucky University. During my time as a student at Eastern Kentucky University, I was able to witness the hard work and passion Mr. Knezevich had for his career. Kyle was very well respected by his colleagues, his students, and the Richmond community. I was often stopped in restaurants, ball games, and at the grocery store by Kyle's students as they would share their enthusiasm about his teaching and guidance in the aviation program.

Kyle had a passion for teaching and mentoring his students. In his teaching position, he helped guide the development of aspiring aviation professionals and assisted graduates of the program in obtaining aviation job placement. Jamie Gaddis, a colleague of Kyle's at Eastern relates that:

> One of Kyle's remarkable qualities was his sincere concern for his students' well-being and success. He actively engaged with their studies, fostering a supporting learning environment and ensuring they were well-prepared for the challenges they would face in their careers. Kyle's commitment extended beyond the classroom; he assisted numerous students in securing employment opportunities and facilitated valuable networking connections within various airports across the country.

While at Eastern, Kyle also continued his association with the Blue Grass Airport in a part-time position performing essentially the same regulatory compliance responsibilities. Kyle was respected by his peers and students alike.

### D. THE OFFENSE CONDUCT

When initially confronted by law enforcement, Kyle admitted that he had produced and retained on his computer surreptitious recordings in bathrooms and locker rooms of both adult and minor males. He has done so in these formal proceedings with full knowledge of his immediate detention with serving a minimum of fifteen (15) years with a potential maximum of thirty (30) years. He, from the onset, realized and accepted the potential severe consequences of his actions.

Important in the considerations of Kyle's sentence are that his production of the video record did not involve sexual contact with any of the victims; did not involve the knowledge of any victim that they had been recorded; and did not involve the distribution or display the retained images to any other person or online medium. According to Federal Sentencing of Child Pornography Production Offenses, prepared by the United States Sentencing Commission (October 2021).[4] "The majority of child pornography production cases (80.9%) occurring in 2019 involved sexual contact."[5] Concededly, the recordings constitute a very disturbing and extreme violation of the individuals depicted in the recording. This conduct is inexplicable. However, there is no allegation that Kyle in any way physically touched or even attempted to contact any of the victims in the recordings.

In addition, the individuals depicted in the recordings had no knowledge they have been recorded. The United States has fulfilled its obligation under the Mandatory Victims Restitution Act of 1996 in contacting any identifiable victims and has not received or provided any restitution

---

[4] This publication updates and expands upon the United States Sentencing Commission's 2012 Report to the Congress: Federal Child Pornography Offenses (the "2012 Child Pornography Report") and builds upon the Commission's recent report on non-production child pornography offenses.
[5] *Id* p. 31.

claims or victim impact statements. To be clear, this fact does not excuse the recordings or his retention of the videos. To do so was an extreme violation of their privacy rights.

There is no allegation that Kyle distributed, displayed or shared the records with any other person or entity. Kyle acknowledges the fact that the wide publication of his arrest and the public awareness of the surreptitious manner the recordings were obtained caused great concern with current and former swim team participants and swim team parents. He cannot change that. He can emphatically state that the recordings remained solely with him. They were not shared with any other person. Again, this does not excuse the fact that he made and retained the recordings and by so doing, extremely infringed upon their expectation of privacy and security. Kyle acknowledges the impact and the potential impact his conduct has on the swim team participants and parents.

E. THE SENTENCING RANGE

Kyle's guideline calculation range is 360 months to life imprisonment. The statutory range is a minimum of fifteen (15) years and a maximum of thirty (30) years. It is respectfully submitted that the guideline range is substantially greater than what is necessary and appropriate to satisfy §3553(a) considerations.

III. SENTENCING CRITERIA AND REQUEST FOR DOWNWARD VARIANCE

This Court is well aware under the decision of the United States Supreme Court in the case of <u>United States v. Booker</u>, 543 U.S. 220 (2005), the sentencing guidelines are no longer binding on the Court. Instead, the Court is required to fashion a sentence within the context of 18 U.S.C. §3553(a)(1) through (a)(7). In imposing a sentence, the Court must consider all of the factors set forth in §3553(a)(1-7). As the Court is aware, 18 U.S.C. §3553(a) reads as follows:

> "(a) Factors to be considered in imposing a sentence,--The Court shall impose a sentence sufficient, but no greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the *particular* sentence to be imposed, shall consider—
>
> (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) The need for the sentence imposed;
>
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>     (B) to afford adequate deterrence to criminal conduct;
>
>     (C) to protect the public from further crimes of the defendant; and
>
>     (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner," (Emphasis added.)

The purpose of this Sentencing Memorandum is not to minimize, excuse, or alter Kyle's involvement in this case, or his acknowledgment and acceptance of his responsibility. Rather, it is to give context and to assist the Court in imposing a sentence it deems appropriate. Counsel has already gone over the history and characteristics as they relate to Kyle, and they are also laid out in detail in the Presentence Investigation Report and character letters in Exhibit A.

Because of the circumstances of the offense conduct considering that he did not contact any of the victims or distribute any of the retained images, Kyle's otherwise successful impact on others and his vision impairment, a downward variance is justified to provide for a sentence at or approaching the statutory minimum.

A downward variance from the guideline range would reflect the seriousness of the offense, promote respect for the law and provide a just punishment. Kyle is sincere in his remorse and commitment to treatment. He is regretful for his actions. He is devastated that he embarrassed his family and the entire community. He intends to use his educational skills as a teacher to provide

9

instruction to and help other inmates. Upon release, his family is committed collectively to engage and monitor Kyle to deter any improper or illegal conduct, protecting the public from any further criminal activity. Most importantly, a sentence at or near the statutory minimum with a recommendation of placement in a facility where a Sexual Offender Treatment Program is available.

VI. REQUESTED DISPOSITION

In light of Mr. Knezevich's history and characteristics, the totality of circumstances surrounding his offense conduct, and the individualized considerations set forth above, as well as any other reasons that may be deemed appropriate and just, it is respectfully requested that the Court sentence Mr. Knezevich to a sentence at or approaching the statutory minimum of fifteen (15) years' imprisonment followed by supervised release conditioned on any and all appropriate treatment, monitored computer use, and adherence to sex offender registration.

The question of where the Bureau of Prisons (BOP) will house Mr. Knezevich is open. The BOP may, in its discretion, determine that Mr. Knezevich is suitable for placement in one of the federal prison system's Sex Offender Treatment Programs (SOTP), such as a program at the Federal Correctional Institute (FCI) in Elkton, Ohio which would also allow his family members to continue to visit. Inasmuch as a SOTP designation falls exclusively within the BOP's purview (i.e., judicial recommendations have no bearing or affect), Mr. Knezevich respectfully requests a recommendation by the Court for incarceration at FCI Elkton for SOTP, which we believe is quite likely given the nature of his offense conduct. Specifically, we ask that the Court include the following language in the imprisonment portion of the Judgment Order:

The Court strongly recommends the defendant be incarcerated and placed at FCI Elkton (OH) so as to permit participation in the Sex Offender Treatment Program and to facilitate regular family visitation.

Respectfully submitted,

COY, GILBERT, SHEPHERD & WILSON
212 North Second Street
P.O. Box 1178
Richmond, Kentucky 40476-1178
(859) 623-3877


  / s /  *Jerry W. Gilbert*
Jerry W. Gilbert

CERTIFICATE OF SERVICE

On April 11, 2024, I electronically filed this document through the ECF system, which will send the notice of electronic filing to all counsel of record. A true and accurate copy of the foregoing has also been forwarded to the following:

Erin M. Roth, Esq.
Assistant United States Attorney
Erin.Roth@usdoj.gov

Brittany Cardin
U.S. Probation Officer
Brittany_Cardin@kyep.uscourts.gov


  / s /  *Jerry W. Gilbert*
Jerry W. Gilbert